Argued March 25; reversed April 28; rehearing denied
September 15, 1931

# HOPKINS *v.* SPOKANE, P. & S. RY. CO. ET AL.

(298 P. 914, 2 P. (2d) 1105)

*Fletcher Rockwood,* of Portland (Carey, Hart,. Spencer & McCulloch and Charles A. Hart, all of Portland, on the brief), for appellants.

*Paul R. Harris,* of Portland (Davis & Harris, of Portland, on the brief), for respondent.

ROSSMAN, J. This is a personal injury action in which the parties concede that their rights are governed by the provisions of the Federal Employers' Liability Act. At the time of his injury the plaintiff was a brakeman in the employ of the defendants, who are common carriers. From a judgment in favor of the plaintiff, based upon a verdict, the defendants appeal.

Since the assignments of error are limited to the single contention that the circuit court erred when it denied the defendants' motion for a directed verdict, we shall proceed at once to a consideration of the evidence. The uncontradicted testimony discloses that the plaintiff was in the employ of the defendants as a head brakeman on one of their freight trains; that is, his duties were performed in the forward part of the train as distinguished from those of the rear or flag brakeman who takes his position in the rear of the train. The plaintiff's injuries befell him at 7 p. m. November 15, 1928, in the city of Bend, when the freight car upon which he was riding, and which was being backed up upon the main line, came into contact with another freight car standing in the converging angle of a stock track too close to the main line. The incidents preceding the collision and which account for the presence of the latter car in its improper position upon the stock track are the following: The defendant maintains the aforementioned stock track, 1,400 feet in length, immediately adjacent to its main line; both ends of the

stock track unite with the main line. Reference to the accompanying sketch, which makes no claim to accuracy, may be helpful.

Bend, being the end of the run, the conductor in harmony with the established practice proposed to store his train upon the stock and main tracks. He planned to leave as many of the cars upon the stock track as could be accommodated there, and then "double back" the rest upon the main line, parallel and opposite to the others. Accordingly when the train, which consisted of the engine, a caboose and 37 cars, reached the west junction of the stock track with the main line the engine left the latter and proceeded to pull the cars onto the stock track. When the train neared the easterly junction of the two tracks it was necessary to stop because the east switch was open. At this point the plaintiff, who was then on top of one of the cars, left his position and came into the engine cab where the engineer advised him of the above plan. The plaintiff then went ahead, set the switch so that the engine could proceed on to the main line, and, after it had gone

forward sufficiently so that the caboose was in the clear on the stock track, the engineer stopped the train. At this point it became the plaintiff's duty to cut the train in two, that is uncouple two of the cars at a point as far back from the easterly junction of the two tracks as was necessary to afford sufficient clearance for the cars which would be backed up upon the main line. In making the cut the plaintiff did so from the engineer's side, that is between the two tracks. The point he selected left seven cars attached to the engine. When he had completed the uncoupling he gave a signal to the engineer, who thereupon proceeded forward until the rear of the seventh car had cleared the switch; thereupon the plaintiff reset the latter so that the engineer could back the cars along the main track into the desired position, and signalled to the engineer. The seven cars were then backed up and as the first of them, a Great Northern car, approached the plaintiff, he boarded it. When it reached the point on the main line opposite the place where the first of the cars (a Milwaukee car) stood upon the stockyard track, the two collided, due to the fact that the plaintiff had cut the train upon what may be described as the angle of the stock track, so near to the easterly junction of the two tracks that an insufficient clearance had been provided for the passage of cars on the main line. In the collision the plaintiff sustained the injuries for which he seeks redress in damages.

At 7 p. m. of November 15, when this accident occurred, the night was dark but the atmosphere was clear. One of the plaintiff's witnesses testified that the angle of divergence by which the stock track left the main track was "narrower" than standard; he added that there was only one other spur track on the defendant's lines having a narrower angle of diver-

gence. Other evidence, however, showed that the frog used at the east union of the two tracks was a standard one. However, if the angle of divergence was not standard the plaintiff apparently was not misled; at least he did not so claim as a witness.

There was nothing unusual about the size of either the Milwaukee or the Great Northern cars and the tracks were the usual distance apart. Had the cut been made further from the east junction a sufficient clearance would have been obtained. No one directed the plaintiff at which point to uncouple the cars, and he was free to do so at any place he selected. The marks made upon the cars by the collision indicate that the southeast corner of the Milwaukee car was within 10 inches of the main line rail when the cut was made.

The sole charge of negligence upon which the plaintiff relies is thus stated in his complaint:

"That plaintiff was inexperienced in the work of making said cut of freight cars on said siding or passing track * * * of which defendants well knew, and defendants carelessly and negligently failed and neglected to warn, advise and instruct the plaintiff of the dangers of said work, * * * and in particular failed and neglected to warn, advise and instruct plaintiff in the manner determining the sufficiency of the clearance between the said siding or passing track and the main track so that box cars left upon the siding track would be in the clear of cars passing along the main track."

At the time of his injury the plaintiff was 21 years of age and was a high school graduate. He was a student at Oregon State College at the time of the trial, receiving grades above the average. Due to the fact that his father had been a station agent for the defendant for many years, and that other members of his family were long engaged in railroad service the

plaintiff answered affirmatively a question which inquired whether his family could be described as a "railroad family." Ever since boyhood he had lived in close vicinity to railroad yards. He himself began work for the defendant at the age of 16, and since that time had worked for it as a yard clerk, round house clerk, storekeeper's clerk, hostler's helper, and finally as a brakeman. As a hostler's helper he participated at times in the switching of locomotives and often saw others perform switching operations. As a yard clerk, in which capacity he served for 15 months, he checked freight cars in the yard, and while thus employed occasionally observed switching operations. Just before becoming a brakeman he worked for a year as an engine watchman and a fire builder in a roundhouse. Previous to his accident he was employed for six weeks as a brakeman, drawing the regular remuneration paid to brakemen; this employment included 15 days spent upon this particular run. Prior to his first trip as a "pay brakeman" he had made six student trips over various parts of the defendants' lines. The train upon which he was employed was a local one which left the station at Wishram at 7 a. m. and did not arrive at Bend until 7 p. m. During the course of the journey much time was consumed in switching and spotting cars at various stations en route, including 50 minutes spent at Metolius. In these operations the plaintiff participated. He testified that he had never made a cut at this particular place; but other evidence indicated the contrary. He, however, freely conceded that he had seen others make the cut. He also swore that he had never been instructed in any method for determining whether a sufficient clearance existed before a proposed cut was made. One of his witnesses, a Mr. J. W. Flynn, testified that the following method is

available to brakemen who are about to make cuts and who desire to determine whether ample clearance exists:

"They generally stand on the inside rail, next to the train, and just reach out and if their hand don't touch the car or anything, it is generally enough to clear the car coming back. Probably it ain't always customary, though to ride that side; that is, to hang on the side of the car, because we are not all on the same sides or anything; where one goes through, another will get caught."

The plaintiff testified that he knew how to make cuts. He willingly admitted that he knew that the bodies of freight cars were wider than the space between the rails, and that when making a cut sufficient clearance must be provided to permit cars to pass on the main line. He estimated that the minimum clearance "should be about two feet; three feet." He readily agreed that in addition to the minimum amount of clearance provision had to be made for the accommodation of workmen riding on the sides of cars. He also conceded that he knew, when he made the cut, that if he did not provide sufficient clearance for the cars that were about to be backed up upon the main track, trouble would ensue. Thus it is evident that he was fully aware of the results that had to be accomplished, of the dangers to be avoided, the consequences that would ensue if a sufficient clearance was not provided, and of the minimum amount of clearance that was needed to assure safety for the operation of cars on the main line.

█ It is generally the duty of the master to warn inexperienced employees as to the dangers incident to a performance of the service in which they are engaged unless the hazard is so obvious that any person of his age, intelligence and experience would observe and

appreciate it without the master's assistance: *Nelson v. St. Helens Timber Co.*, 66 Or. 570 (113 P. 1167, 135 P. 169). But, if the employee obtained complete knowledge of the danger from any source, whether from his own observations, experience, or from others, so that any warnings from his employer would not add to his information, the failure of his master to warn was not culpable, because the source of the workman's information and appreciation of the danger is not a material point: Labatt's Master & Servant (2d Ed.), § 1143, and 39 C. J., Master & Servant, § 612, p. 499; *Traffic Motor Truck Corp. v. Claywell*, 12 Fed. (2d) 419.

It must be self-evident from the testimony of the plaintiff that he was fully aware of the dangers that attended upon a failure to provide sufficient clearance, and that he needed no warnings upon that subject. Hence, as we proceed, we shall assume that he fully appreciated those hazards. The issue for determination, therefore, narrows itself to the question whether the record contains evidence capable of supporting a finding that the defendant was negligent in failing to acquaint the plaintiff with the method for determining clearance described by Flynn.

It may be stated generally that when the employee does not possess as complete a knowledge, either actually or constructively, of the appropriate means of avoiding a hazard incidental to his employment as the master, the latter owes a duty to the employee to impart the necessary information: *Nelson v. St. Helens Timber Co.*, supra. When the employer is aware of the fact that the employee is inexperienced, or when the latter, by reason of his immature years or lack of normal mentality, is incapable of selecting a practical means of avoiding the perils of the employment, the

exactions of the rule demand more careful instruction. It follows that the sufficiency of the instructions must be commensurate with or graduated according to the knowledge, experience and intelligence of the employee: Labatt's Master & Servant (2d Ed.), § 1159, 31 C. J., Master & Servant, § 608, p. 495. As the age of a minor approaches 21 years the sufficiency of the instruction is gauged more and more nearly by the same considerations that affect adults: *McGinnis v. Canada Southern Bridge Co.,* 49 Mich. 466 (13 N. W. 819); *Haring v. Great Northern R. Co.,* 137 Wis. 367 (119 N. W. 325); *Wilson v. Steel Edge Stamping Co.,* 163 Mass. 315 (39 N. E. 1039); Labatt's Master & Servant (2d Ed.), § 1160. The plaintiff was past 21 years of age at the time of his injury, and we know of no reason why there should not be applied to him all of the rules applicable to an adult. Likewise since he was an intelligent young man who possessed the benefit of a high school education we must assume that the defendant was justified in regarding him as one capable of acquiring some information by observing the conduct of others. Further, we feel that a conclusion is certainly unwarranted that he was wholly inexperienced in the performance of the duties of a head brakeman. The evidence, to which we have already alluded, discloses that he had worked for several years in and about railroad yards, checking freight cars upon stock tracks, building fires in locomotives, acting as the watchman of engines, participating in the movement of the locomotives about the terminal yards, and observing the switching of cars. In addition to the foregoing he had had the benefit of several student trips as a brakeman and six weeks actual experience as one, including the discharge of services incidental to the uncoupling of cars at the very point where this accident occurred. He was receiving

the normal wages of a brakeman and was regarded by his fellow employees upon this train as competent. Possibly, however, the jury concluded that he was inexperienced, and for this reason alone, as we proceed, we shall deem him an employee who lacked the complete experience of the seasoned brakeman.

■ We now ask ourselves whether there is any evidence in the transcript upon which a jury could properly base a finding that the defendant was negligent in not having informed the plaintiff of the test suggested by Lynch as a means of determining whether a sufficient clearance had been provided.

In *Gibson v. Oregon Short Line Ry. Co.*, 23 Or. 493 (32 P. 295), the plaintiff, an inexperienced track walker, was injured by one of his employer's trains which overtook him when he was upon a trestle. He claimed that the defendant was negligent in having failed to instruct him to step upon one of the caps of the trestle when he was caught in such a predicament. This court held that since the danger was obvious and since the caps were visible as places of safety "the defendant had a right to assume that the plaintiff would avoid the risk incident to his employment without any special instructions." In *Haring v. Great Northern R. Co.*, supra, the deceased was a switchman 21 years of age, who for a month had been engaged in switching cars in a yard where there was a loading platform which provided only sufficient space between the cars and the edge of the platform to prevent contact between the two. The deceased was crushed to death while working alongside of the platform at a point where one of the tracks curved about the platform in such a manner that when the forward part of a car came alongside there was twenty inches of clearance

which narrowed to five and one-half inches when the center of the car reached the same point. The contention was urged that the employer should have instructed the deceased concerning the situation and the means of avoiding the danger. The court held that the danger of which complaint was made "was an open and obvious one to persons possessed of ordinary intelligence," and that hence the lower court properly granted the defendant's motion for a nonsuit. In *McGinnis v. Canada So. Bridge Co.*, the plaintiff, twenty and one-half years of age, was in the defendant's employ as a switchman. His foot became caught in the frog of a switch, and in his suit for damages he alleged failure to instruct and warn as a foundation of his action. The court held, however, that since he was a person of average intelligence, who understood the danger into which he fell, "and had in mind the purpose to avoid it," the judgment of the lower court in favor of the defendant should be sustained. In *Burnell v. West Side R. Co.*, 87 Wis. 387 (58 N. W. 772), the facts were: a motorman was injured while cleaning a commutator; he was 24 years of age, of ordinary intelligence, had had eight days of instruction as to his duties and had seen a commutator cleaned on two previous occasions. It was held that no liability could be predicated upon a claim that the master was negligent in failing to instruct. In *Wike v. Oregon-Washington R. & N. Co.*, 83 Or. 678 (163 P. 825), we held that the circuit court committed error when it charged that the master owed a duty to instruct a carpenter in the manner of lagging an engine. The decision pointed out "the work was simple, well within the comprehension of any man who had had a half day's experience at it." Numerous authorities similar in effect to the above could be readily cited; but since the outcome of

practically all cases is dependent upon the facts of each, and since none, which have come to our attention, involve circumstances precisely similar to those present in the instant case, we shall review no more of them except the three following cases upon which plaintiff relies: *International Paper Co. v. Robin,* 167 Fed. 922; *Nelson v. St. Helens Timber Co.,* 66 Or. 570 (133 P. 1167, 135 P. 169), and *Prement v. Wells,* 65 Or. 336 (133 P. 647). All three of these cases can be distinguished somewhat from the instant one in the circumstance that while in the present case the plaintiff was responsible for the improper presence of the Milwaukee car in the position where it caused his injury, in the three above cases the employer was responsible for the existence of the harmful instrumentality. Further the decision in *International Paper Co. v. Robin* is somewhat weakened by the spirited dissenting opinion. The majority opinion held that the danger was not so obvious that the workman of necessity assumed it; the facts were that the workman, in moving a very heavy roll of paper 96 inches long, was required to place the roll upon his handtruck in such a manner that the top of the roll was back of him. While proceeding, the top of the roll struck an obstruction overhead, thus causing his injury. Hence, while the truckman was proceeding he was unable to observe. But workmen who owe the duty to observe and have the opportunity, meet with results opposite to those of the case just reviewed. See for instance, *Jennings v. Tacoma Ry. & Motor Co.,* 7 Wash. 275 (34 P. 937), and *Sage v. Wyandotte Terminal Ry. Co.,* 193 Mich. 194 (159 N. W. 139). In *Nelson v. St. Helens Timber Co.,* the second of the cases cited by the plaintiff, the workman was directed to perform a dangerous act not within the scope of his employment and which exposed

him to a hazard not contemplated in his contract of service. He had never performed a similar act, had lived in this country for only a year and a half, and apparently lacked the intelligence possessed by our present plaintiff. *Prement v. Wells,* the third of plaintiff's cited cases, did not involve a question of instruction, but one of warning. In that case the injured workman, who was a Greek roustabout, had been in this country for only a short time. It seems to us that the above cases cannot be said to demand that we should conclude the defendant owed the plaintiff a duty to instruct him how he could measure a space of three feet.

Measuring a distance of three feet from a rail to a freight car is certainly a simple process, especially for any one who has had the benefit of a high school education, and who has been employed in and about railroad yards for five years. In the present instance a clearance of one foot would have avoided the accident. Hence, the inquiry really reduces itself to the problem whether the failure of the defendants to instruct upon the means of making such a measurement was culpable. The plaintiff testified that when he had uncoupled the cars he stepped to the space between the main and the stock track; therefore, a mere glance to the ground would have informed him whether or not he had provided sufficient clearance. It is true that the night was dark, but he possessed a brakeman's lantern which would have afforded sufficient illumination. Almost every one possesses some standard for measuring a distance of three feet, and surely every intelligent brakeman before the end of six weeks of employment would have devised a practical means of measuring clearance. The plaintiff testified that the defendant did not instruct him, but he did not disclaim knowledge of how to measure distance. The judicial consequences of

constructive knowledge are the same as those of knowledge imparted by the employer. We are convinced that the plaintiff's failure to produce the desired result was not due to his ignorance of Flynn's rule, but to his negligent failure to look. Apparently brakemen do not commonly employ Flynn's method; this observation is based upon the fact that the plaintiff testified that he had never seen any member of a train crew measure distance. The means of measuring short distances are obvious and can be readily grasped by any one with ordinary comprehension. We do not believe that it was incumbent upon the defendant to instruct this intelligent young man upon such a simple element of his task.

In order to support the jury's verdict the plaintiff is required to point to evidence in the record more substantial than a mere scintilla. The scintilla of evidence rule is not employed in the federal courts: *Gunning v. Cooley*, 281 U. S. 90 (50 S. Ct. 231, 74 L. Ed. 720). In the case just cited the Federal Supreme Court quoted the following rule, applicable to the direction of a verdict, from *Improvement Co. v. Munson*, 14 Wall. 442 (20 L. Ed. 867):

"In every case, before the evidence is left to the jury there is a preliminary question for the judge not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it upon whom the onus of proof is imposed."

If it can be said that article VII, section 3, Oregon constitution (Oregon Code 1930, p. 131) which provides "no fact tried by a jury shall be otherwise reexamined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict," establishes in this state the scintilla of evi-

dence rule we do not believe that it is applicable to actions governed by the Federal Employers' Liability Act. Any legislation governing the amount of proof required to establish the liability is a rule of substantive law and not one of procedure. This being true the following statement taken from *Chicago, Milwaukee & St. Paul Ry. Co. v. Coogan,* 271 U. S. 472 (46 S. Ct. 564, 70 L. Ed. 104), in reference to the Federal Employers' Liability Act is pertinent:

"The employer is liable for injury or death resulting in whole or in part from the negligence specified in the act; and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to the control of the several states."

See to similar effect 45 U. S. C. A., p. 274, footnote 473.

After having carefully reviewed the evidence we are satisfied that the plaintiff failed to produce sufficient proof upon which the jury could properly base its verdict for him. It follows that the circuit court erred when it failed to direct a verdict for the defendants. Such being our conclusion the cause will be remanded with instructions to dismiss.

BEAN, C. J., RAND and KELLY, JJ., concur.

---

Petition for rehearing denied September 15, 1931

## ON PETITION FOR REHEARING
### (2 P. (2d) 1105)

ROSSMAN, J. Respondent's carefully prepared petition for a rehearing has caused us once more to bestow much consideration upon this action.

The brief accompanying the petition cites and reviews many authorities, most of which we have read.

None of them, however, involved a set of circumstances where an intelligent young man, who had ample time to make measurements, came to his injury by reason of his failure to do so. That is the situation brought before us by this appeal. The plaintiff was not called upon to measure clearance between the top of a car and the ceiling of a tunnel, while riding upon a rapidly moving train approaching the tunnel, like *Wainright v. Railway Co.*, 9 Ohio Circuit Dec. 530; nor was the plaintiff required to leap upon a locomotive, like the nineteen-year-old Syrian laborer in *Cannon v. Railway Co.*, 29 S. D. 433 (137 N. W. 347); nor did the plaintiff's duty subject him to the hidden danger of repairing, as a lineman, an electrical transformer, like the deceased in *Fisher v. Prairie*, 26 Okl. 337 (109 P. 514); nor was he deceived into putting his hand into a power-driven sausage cutter by an unexpected crust which formed over the top of the hopper, like the inexperienced workman in *Richardson v. Swift & Co.*, 37 C. C. A. 557 (96 Fed. 699). The foregoing and many of the other cases upon which the plaintiff relies may be distinguished from the instant case in the circumstance that those injured workmen were required to act suddenly or instantaneously; in some instances were required to keep up with the machine which they were attending. All of them were inexperienced workmen; in fact, the plaintiff in *Cannon v. Railway Co.* was a laborer who declared he had been drafted against his will to act as a switchman. In all of those instances the opportunity for measuring distance or taking note of the dangerous factor was very brief.

In the case at bar nothing was in motion when the plaintiff was required to act. Nothing hurried him. He freely conceded that he was aware of the results that would follow if he failed to provide sufficient

clearance. His sole criticism of his employer's instructions is an alleged failure of the latter to instruct him how to measure the distance of three feet. We all know from our earliest childhood experiences the results that followed when we failed to provide sufficient clearance, and each one of us can recall as one of his earliest achievements the learning of a method of assuring clearance for our playthings and ourselves. This involved nothing more than the measuring of short distances. Everyone daily is required to measure distance in providing clearance for his safety in making movements; we do so as we park our automobiles, place furniture, walk about the streets, enter elevators, etc. Thus from innumerable experiences extending from infancy we all have acquired methods of measuring short distances. And in the absence of being compelled to use them hurriedly or in the midst of much motion and confusion our methods do not fail us where precise accuracy is nonconsequential.

There was nothing complicated about the task which the plaintiff was required to perform. He knew, according to his own frank admissions, that in making the cut he must provide two or three feet of clearance. The objects to be separated by this distance (as a matter of fact one foot of clearance would have sufficed) were plainly visible; the one was a bulky freight car and the other was a bright, shining rail. Both were motionless and the plaintiff was between the two. Sufficient time was available so that he could have measured the space by any method which his past experiences had taught him, and so that he could also have applied any test he cared to select as an assurance that he had actually provided sufficient space. As he stood there he knew that upon his signal the engine with its accompanying cars, with himself aboard, after going

forward a short distance would return upon the rails where he stood, and that they would be unable to dodge the obstructing freight car. Under these circumstances, we do not believe that anyone can say that the defendants' failure to tell the plaintiff how to measure a distance of three feet was the cause of his omission to provide a foot or more of clearance.

The plaintiff urges that the issue involved in this case was for the jury's determination. As above suggested, the foregoing facts were established by uncontroverted evidence. In fact, the plaintiff himself employs the above facts in his argument that an issue awaited the jury's determination. Apparently he concedes that, if he had been taught by the defendant how to measure three feet and had failed to employ the method thus taught him at the crucial moment, the responsibility for the accident would have been upon him. But, as stated in our previous decision, a failure by the employer to instruct is not culpable if the injured employee acquired the same knowledge from other sources. We believe it is evident that he did.

We conclude that the petition for rehearing must be denied.

BEAN, C. J., RAND and KELLY, JJ., concur.